**TENNESSEE CONSOLIDATED COAL COMPANY and Grundy Coal Company, Plaintiffs-Appellees,**

v.

**UNITED MINE WORKERS OF AMERICA, Defendant-Appellant.**

No. 18820.

United States Court of Appeals
Sixth Circuit.

Sept. 19, 1969.

Harrison Combs, Washington, D. C., (Edward L. Carey, Willard P. Owens, Washington, D. C., E. H. Rayson, Knoxville, Tenn., M. E. Boiarsky, Charleston, W. Va., on the brief), for appellant.

John A. Rowntree, Knoxville, Tenn., (William D. Spears, Chattanooga, Tenn., Judson Harwood, Nashville, Tenn., William M. Ables, Jr., South Pittsburg, Tenn., Paul D. Kelly, Jr., Jasper, Tenn., Fowler, Rowntree, Fowler & Robertson, Knoxville, Tenn., on the brief), for appellees.

Before WEICK, Chief Judge, and PECK and COMBS, Circuit Judges.

WEICK, Chief Judge.

The suit in the District Court was brought by Tennessee Consolidated Coal Company (TCC) and its subsidiary, Grundy Mining Company (Grundy), against United Mine Workers of America (UMW) and West Kentucky Coal Company (West Kentucky), to recover damages for violations of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 and 2.

The plaintiffs charged that UMW and large coal companies who form the Bituminous Coal Operators Association (BCOA) engaged in an unlawful conspiracy to eliminate and suppress competition and production in the coal industry and to control the Southern Appalachian and Southeastern Tennessee coal fields. The plan of the conspiracy was that only the coal operators who signed and complied with the National Bituminous Coal Wage Agreement of 1950 as amended, including the 1958 Supplement, the Protective

Wage Clause (PWC), would be permitted to carry on operations in that territory. It was alleged that the small companies could not operate profitably under the provisions of the National Agreement; that those who did not sign were picketed by UMW with force and violence, were not permitted to operate, and were forced out of business; and that plaintiffs were damaged as a result of the conspiracy. It was further charged that UMW invested $25,000,000 in acquiring control of West Kentucky Coal Company and its subsidiary, Nashville Coal Company, which was one of the largest members of BCOA, and that a portion of the investment was used for operational expenses, including payments into UMW's pension fund. Plaintiffs further contend that bids made to the Tennessee Valley Authority in the late 1950's and subsequent years for coal contracts by the major coal companies, including West Kentucky, were at prices below the prices charged in their other markets and in instances were below cost. As a result of this predatory bidding, the plaintiffs were unable to obtain long term coal contracts.

UMW denied that it engaged in any conspiracy. It asserted that all it did was to engage in traditional union activities to promote uniform wages in the coal industry for the betterment of its members.

West Kentucky was voluntarily dismissed from the case without prejudice. The case was tried before a jury which returned a general verdict in favor of the plaintiffs and made findings on special issues as follows:

"GENERAL VERDICT FORM

(1) We, the jury, find the United Mine Workers of America ___did___ engage in a conspiracy, as alleged by the plaintiffs, to
(did-did not)
unreasonably restrain trade or to monopolize commerce in the bituminous coal industry outside or beyond the exemption granted by the antitrust statutes to a labor organization and in violation of Section 1 or Section 2 of the Sherman Antitrust Act.

(2) [If your answer to Issue No. (1) was that the defendant did violate the Sherman Act] We, the jury, find that the plaintiff,

Tennessee Consolidated Coal Company, ___was___ damaged in its
(was-was not)
business or property as a proximate result of defendant's violation of the Sherman Act.

(3) [If your answer to Issue No. (2) was that Tennessee Consolidated Coal Company was damaged as a proximate result of defendant's violation of the Sherman Act] We assess damages for Tennessee Consolidated Coal Company in the following amount. $977,500

(4) [If your answer to Issue No. (1) was that defendant did violate the Sherman Act] We, the jury, find that the plaintiff, Grundy Mining Company ___was___ damaged in its business or property as a
(was-was not)
proximate result of defendant's violation of the Sherman Act.

(5) [If your answer to Issue No. (4) is that Grundy Mining Company was damaged as a proximate result of defendant's violation of the Sherman Act] We assess damages for Grundy Mining Company in the following amount. $22,500.

s/ R. O. DAVIS
*Jury Foreman*"

"SPECIAL ISSUES

(1) We, the jury, find that the United Mine Workers of America

___did___ so act as to forfeit its exemption under the antitrust
(did-did not)
laws.

(2) We, the jury, find that prior to and apart from the National Bituminous Coal Wage Agreement as amended in 1958, the defendant,

United Mine Workers of America, ___did not___ conspire, combine
(did-did not)
or conspire, combine or contract with the coal operators who signed the National Agreement that it would contract with non-signatory operators only upon the terms and conditions of the National Bituminous Coal Wage Agreement as amended from time to time.

(3) We, the jury, find that the United Mine Workers of America and signatories of the National Bituminous Coal Wage Agreement

as amended in 1958 ___did___ intend that by the terms of the
(did-did not)
Protective Wage Clause the United Mine Workers of America agreed that it would contract with non-signatory operators only upon the terms and conditions of the National Bituminous Coal Wage Agreement as amended from time to time.

s/ R. O. DAVIS
*Jury Foreman*"

———◆———

UMW then filed a motion for judgment notwithstanding the verdict and in the alternative for a new trial which the court carefully considered in an opinion appearing on 41 pages of the printed record. 102a–143a.

The District Court found that the damages in the amount of $977,500 awarded to TCC by the jury were excessive and suggested a remittitur of $500,000, which was accepted by TCC. The court then denied the motion for judgment notwithstanding the verdict and the motion for a new trial, and entered judgment in favor of TCC against UMW in the amount of $1,432,500 and in favor of Grundy in the amount of $67,500, being three times the amount of actual damages sustained by them. The Court allowed $150,000 attorneys fees to counsel for plaintiffs.

UMW has appealed. The parties have filed extensive well written briefs, a record consisting of four large volumes of a Joint Appendix and two supplements thereto, in addition to an appendix attached to one of the briefs.

Sufficiency of the Evidence

TCC was organized as a corporation in 1905 and owned about 50,000 acres of land in southeastern Tennessee on a portion of which prior to 1959 it was engaged in mining coal. TCC had leased a substantial portion of its coal-bearing land for mining properties to small truck mine operators.

UMW, an international labor union organized in 1905, had represented a majority of mine workers in the southeastern Tennessee coal fields for many years.

The facts of the case appear in the opinion of the District Court, previously mentioned, and in his reported opinion in Ramsey v. United Mine Workers, 265 F.Supp. 388 (E.D.Tenn.1967). *Ramsey* was an anti-trust action tried by the same Judge, but without a jury, and resulted in a judgment in favor of UMW which was affirmed by an equally divided court in Ramsey v. United Mine Workers, 416 F.2d 655 (6th Cir. 1969). The only significant difference between the evidence as introduced in *Ramsey* and as

fully set forth in that opinion and the evidence in the present case was evidence of violence in the southeastern Tennessee coal fields discussed on pages 428–429 in the *Ramsey* opinion and omitted in the case at bar. Additional evidence was introduced relating to the Protective Wage Clause, consisting of minutes of the Joint Industry Contract Committee which functioned as a joint enforcement effort on the part of UMW and the signatory operators following the 1958 Amendment to the National Bituminous Coal Wage Agreement. We will therefore not restate the facts except when necessary for purposes of clarity.

UMW points out that the court in *Ramsey*, on almost identical evidence as in the present case, and another District Court in Lewis v. Pennington, 257 F. Supp. 815 (E.D.Tenn.1966), with quite similar evidence, resolved the issues of liability in favor of UMW, and that we affirmed the judgment in *Pennington*. 400 F.2d 806 (6th Cir. 1968). UMW argues that it was therefore wrong for the jury to resolve the factual issues differently and that the verdict and judgment should be set aside and the complaint dismissed.

The doctrine of res judicata has no application as the present case involves different plaintiffs, who were not parties or privies to *Ramsey* or *Pennington*. Lawlor v. National Screen Serv. Corp., 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed. 1122 (1955).

The judge who heard *Ramsey* without a jury also presided at the jury trial in the present case. The evidence was conflicting. The judge did not think that the jury in the present case was bound by his factual findings in *Ramsey*. Neither do we.

In Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp., 264 F.2d 602, 605 (9th Cir. 1958), the court said:

"But it must be kept in mind that this is a question of fact which the jury has decided against appellants. It makes no difference that the jury found the facts and the intentions of the parties proved a conspiracy here, whereas a trial judge, sitting without a jury, found to the contrary on somewhat similar facts and his findings and judgment were affirmed by this Court. See Fanchon & Marco, Inc. v. Paramount Pictures, Inc., 9 Cir., 215 F.2d 167. There is no power in this Court to reverse a verdict on such grounds. The only problem is whether there was sufficient evidence to submit to the jury. This is a problem of law."

The only test to be applied by us is whether the verdict of the jury is supported by substantial evidence. The District Court in the present case found substantial evidence to support the verdict of the jury. We agree.

We should also point out that *Pennington*, which involved similar evidence, was first tried before a jury. On appeal we held, in an opinion written by Judge Shackelford Miller, that the evidence was sufficient to take the case to the jury and that the District Judge did not err in denying UMW's motion for a directed verdict. Pennington v. United Mine Workers, 325 F.2d 804 (6th Cir. 1963). The Supreme Court in reviewing our decision held in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed. 2d 626 (1965), that UMW's motion for a directed verdict and for judgment notwithstanding the verdict "were correctly denied." *Id.* at 661. 85 S.Ct. 1585. It reversed because of errors in the admission of evidence and in instructions to the jury.

In subsequent retrials of *Pennington* and *Ramsey*, which were tried before courts without a jury, the courts resolved factual issues in favor of UMW. It was not suggested by either court that motions to dismiss should have been granted at the close of plaintiff's evidence or at the close of all of the evidence. The District Judge in the present case was correct in denying motions for a directed verdict and for judgment notwithstanding the verdict.

Is the Jury's Finding on Issue No. 3 Supported by Substantial Evidence?

The National Bituminous Coal Wage Agreement of 1950 as amended, effective December 1, 1958, contained the Protective Wage Clause (PWC) which provides:

### "PROTECTIVE WAGE CLAUSE

"The United Mine Workers of America (which, as used in this Clause, includes all of its Districts, Local Unions, Officers or Agents) and the Operators signatory hereto affirm their intention to maintain the integrity of this contract in all of its parts. The objective of this contract is to provide the maximum possible continuity and stability of employment under the conditions set forth herein. The parties hereto agree that bituminous coal mines shall be so operated as not to debase or lower the standards of wages, hours, safety requirements and other conditions of work, established by this contract. The parties recognizing their obligation each as to the other to exercise all possible efforts and means to attain these objectives further agree as follows:

A. During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto."

The finding of the jury as to the intent of the clause reads:

"We, the jury, find that the United Mine Workers of America and signatories of the National Bituminous Coal Wage Agreement as amended in 1958 did intend that by the terms of the protective wage clause, the United Mine Workers of America agreed that it would contract with nonsignatory operators only upon the terms and conditions of the National Bituminous Coal Wage Agreement as amended from time to time." (1781a)

The importance of this finding appears in the language of the Supreme Court in *Pennington*, where the Court said:

"We have said that a union may make wage agreements with a multiemployer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior.[2] But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry." (*Id.*, 381 U.S. at 665–666, 85 S.Ct. at 1591).

[2]. "Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union. The union need not gear its wage demands to wages which the weakest units in the industry can afford to pay. Such union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional direct or indirect evidence of the

conspiracy. There was, of course, other evidence in this case, but we indicate no opinion as to its sufficiency."

■ UMW contends that the protective wage clause is clear and unambiguous and therefore the construction of the clause is for the court and not the jury. Dale v. Preg, 204 F.2d 434, 14 Alaska 299 (9th Cir. 1953). The trouble with this contention is that every court which thus far has undertaken to construe the clause has held it to be ambiguous. Judge Wilson so stated in *Ramsey* (265 F.Supp. 388 at 412), and in the present case. Judge Taylor in *Pennington* said: "The language in Paragraph A may not be as clear as it might be." 257 F.Supp. 815 at 862. On appeal, we held in *Pennington*: "The Protective Wage Clause is capable of two reasonable constructions * *." 400 F.2d at 814.

■ Whether the terms of the contract are ambiguous is a question of law for the court to determine. Steele v. McCargo, 260 F.2d 753 (8th Cir. 1958). When the court has determined that the contract is ambiguous the terms of the contract are to be determined by the jury if the case is tried by a jury, or by the court if the case is tried by a court. Evidence of the surrounding circumstances and the practical construction of the parties is admissible to aid in its interpretation. United States v. Continental Oil Co., 364 F.2d 516 (10th Cir. 1966); Steele v. McCargo, *supra*; Hawkins v. Frick-Reid Supply Corp., 154 F. 2d 88 (5th Cir. 1946).

The record contains an admission by counsel for UMW that the PWC was a "quid pro quo." Paragraph A was demanded by BCOA. Paragraph B, containing the promise of the signatory operators, was demanded by UMW. In this paragraph the operators agreed to boycott coal not produced in conformity with the national agreement. UMW faithfully complied with Paragraph A in all collective bargaining agreements which it entered into. UMW struck operators who refused to agree to the national contract. The record in *Ramsey* is replete with evidence of mass picketing, force and violence.

Paragraphs C and E of PWC set up a "Joint Industry Contract Committee" and Joint District Contract Committees to try UMW or any operator for violations of the provisions of the PWC.

Paragraph D required UMW to report to the Committees complete lists of all operators whose operations are under contract with the union.

Paragraph E required UMW to make available to the committees all contracts, agreements or understandings entered into by UMW with any operator.

The Joint Industry Contract Committee sent out forms to operators requiring them to certify that they had fully complied with the national agreement.

The District Judge, in construing PWC in *Ramsey*, said it did not contain an express commitment on the part of UMW not to bargain with any other operator on any terms other than the national agreement, but by a preponderance of the evidence he found that UMW did tacitly or impliedly so agree. Under the clear proof rule he held the commitment could not be implied in *Ramsey*.

In the drafting of such an important agreement as PWC, we can hardly assume that UMW and BCOA were represented by lawyers who were ignorant of the anti-trust laws. Nor should we assume that knowledgeable counsel would draft a written agreement in which the parties expressly agreed to violate the anti-trust laws.

The fact that officers and agents of UMW and of BCOA denied any agreement to impose the national contract on all operators was not conclusive on the jury, which had the right as well as the duty to consider their denials in the light of the other evidence in the case.

In the present case the District Judge in his opinion said:

"Turning next to the defendant's contention that there was an absence of any evidence to support the verdict of the jury on Special Issue No. (3), relating to the P.W.C., the Court is of

the opinion that this contention is likewise not sound. In support of its contention in this regard the defendant again relies heavily upon the opinion both of this Court in the *Ramsey case* and the opinion of the Court in the *Pennington case* wherein each Court upon considering the evidence relating to the P.W.C., concluded that the P.W.C. should not be construed so as to forfeit the defendant's labor organization exemption from the antitrust laws. It should be pointed out that this conclusion in both the *Ramsey* case and the *Pennington* case was reached by the Court sitting as a trier of facts and on the basis of conflicting evidence. All that was heretofore said with regard to findings of fact in the *Ramsey* and *Pennington* cases contrary to the verdict of the jury in this case not being the test of the sufficiency of the evidence to support the present verdict would be equally applicable here. Again, it should be repeated that the true test of the verdict is whether substantial evidence exists in the record to support the verdict. While once again if this Court were now called upon to weigh the evidence as a trier of facts it would reach the same conclusion with respect to the meaning of the P.W.C. as it reached in the *Ramsey* case, the Court is nevertheless of the opinion that substantial evidence exists in support of a contrary conclusion."

■ We agree with the District Court that the finding of the jury is supported by substantial evidence.

Did the District Court Misinterpret the Jury's General Verdict in Holding That It Was Not Dependent Upon the Jury's Special Issue Finding As to the Protective Wage Clause?

In considering this issue on the UMW's motion for judgment notwithstanding the verdict, the District Court held:

"Turning finally to the defendant's contention as to the effect on the general verdict of the jury's verdict on the P.W.C., as found in Special Issue No. (3), it should be borne in mind that the general verdict is not necessarily dependent upon the verdict on Special Issue No. (3). In considering the general verdict, the Court must look to all of the evidence and not merely the evidence in regard to the P.W.C. Moreover, in arriving at their general verdict the jury was charged with the duty of determining whether the defendant had committed an antitrust violation during the period of September 24, 1959, through the end of 1963, the period of limitations of this lawsuit. Evidence of conduct prior to September 24, 1959, was relevant only as it may or may not have reflected upon what the defendant did or refrained from doing during the period following September 24, 1959. Thus, neither Special Issue No. (2), wherein the jury found the defendant had not conspired prior to the 1958 Amendment with any coal operators to impose the conditions of the National Bituminous Coal Wage Agreement upon other coal operators, nor Special Issue No. (3), wherein the jury found that the defendant intended by the language of the P.W.C. to commit itself to impose the National Bituminous Coal Wage Agreement on all coal operators with whom it thereafter negotiated, would necessarily be determinative of the general verdict on the issue of liability. The Court is accordingly of the opinion that there does exist substantial evidence in the record in support of the jury verdict on the issue of liability." (p. 121).

UMW contends that the general verdict must be read in conjunction with Special Issue No. (2) in which the jury found that *"prior to and apart from"* (emphasis added) the National Bituminous Coal Wage Agreement as amended in 1958, the UMW did not conspire with the coal operators to impose the terms of the National Agreement upon non-signatories. UMW submits that the "prior to and apart from" language limits the basis of liability in the general verdict to the protective wage clause alone. UMW argues

the doctrine of *inclusio unius est exclusio alterius* and concludes that the general verdict cannot be supported by a finding of predatory pricing by West Kentucky since there was no special finding by the jury on that issue. Since the issue of predatory conspiracy was not found specifically by the jury, UMW contends that it was removed from the case. UMW does not cite any authority to support its contention.

Plaintiffs argue that the finding of the jury under Special Issue No. (2) did not exonerate UMW from conspiratorial conduct. Plaintiffs insist that the issue of predatory conspiracy as well as the protective wage clause was submitted to the jury and that counsel argued both issues to the jury. (1736a–1742a). The special issues were submitted by the Court to the jury over UMW's objection after counsel's arguments. In submitting the special issues Judge Wilson said:

> "Now then, ladies and gentlemen, in addition to the general verdict form, the Court will ask that you respond to certain special issues. By asking that you respond to these special issues, the Court does not suggest by any means that these are the only issues that will be for your decision, you are to decide all issues in accordance with the instructions of the Court, but the Court does request that you respond also to these issues in addition to your response to the issues as set forth in the general verdict form."

■ Under Rule 49(b) of the Federal Rules of Civil Procedure the court may require a jury to return a general verdict accompanied by answers to written interrogatories upon one or more issues of fact, the decision of which is necessary to the verdict. The form of the interrogatories submitted to the jury is within the discretion of the trial judge. *Erwin v. Keck*, 351 F.2d 403 (6th Cir. 1965). Rule 49(b) provides:

> "When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in

accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial."

In interpreting this section of Rule 49(b) the Tenth Circuit held in Kirkendoll v. Neustrom, 379 F.2d 694 (10th Cir. 1967), that where, after answers to special interrogatories were read, the court asked if there was any reason why the jury should not be discharged and both parties answered in the negative, defendant had acquiesced in the court's discharging the jury and thereby waived any objection to the general verdict on grounds of inconsistency with a special finding. Cundiff v. Washburn, 393 F.2d 505 (7th Cir. 1968); Employers Casualty Co. v. Dupaquier, 338 F.2d 336 (5th Cir. 1964). The court further held in *Kirkendoll*, in considering whether there was an inconsistency between special findings and the general verdict, every reasonable indulgence should be made in favor of the general verdict. (*Id.*, 379 F.2d at 699). It was the duty of the court to harmonize the answers of the jury to interrogatories if it is possible under a fair reading of them. If there is a view of the case that makes the jury's answers consistent, they must be resolved that way. Gallick v. Baltimore & Ohio R. R. Co., 372 U.S. 108, 119, 83 S. Ct. 659, 9 L.Ed.2d 618 (1963).

■ In the present case after the jury returned its findings on the special issues and its general verdict the court inquired:

> "Is there anything further that any counsel wishes to raise before the Court excuses the jury in this case?" (1783a).

Counsel for both parties replied negatively and the jury was discharged. If counsel for UMW thought the special findings were inconsistent, unclear or ambiguous, he should have raised his objections at that time. Had objections been made, the court could have resubmitted them to the jury for further consideration. Furthermore, UMW had

ample opportunity to submit its own interrogatories on the issue of predatory conspiracy when the court submitted its interrogatories. Having failed to take advantage of these two opportunities, and having failed to object to instructions to the jury on the issue of a predatory conspiracy, UMW cannot now be heard to claim that the issue was not included in the general verdict.

The view adopted by the District Judge in his opinion is consistent with the jury's answers. We approve it.

### The Court's Instructions to the Jury

The court's instructions to the jury appear on sixty-five pages of the printed record. They were carefully prepared and covered a multitude of issues and questions raised by the parties. UMW made many objections to the charge. Its objections are stated at length on eleven pages of the record.

The court thoroughly explained to the jury the nature of the case, the respective contentions of the parties, and defined the issues and the law applicable thereto.

Instructions to a jury in a protracted and complex anti-trust case are not the easiest type of instructions for a trial judge to prepare. We have carefully examined the instructions and are of the opinion that they stated the respective contentions of the parties fairly, defined the issues properly, and applied the law favorably to UMW.

The principal complaint of UMW is that the District Judge did not apply to all of the issues in the case Section 6 of the Norris-LaGuardia Act (29 U.S.C. § 106) which requires that liability of a labor organization for the acts of its officers, agents and members, be shown by clear proof. UMW did concede, however, that damages need be shown only by a preponderance of the evidence.

Section 6 does provide that participation, authorization or ratification must be shown by clear proof. Section 6 does not state that the unlawful acts must be shown by clear proof.

The District Judge, after discussing the preponderance rule in his charge, stated:

"Now, ladies and gentlemen, there is one issue in this case upon which the plaintiffs have a heavier burden of proof than I have just described. That is whether the defendant actually participated in or actually authorized or actually ratified actions which violated the Sherman Act, or other Federal Antitrust Laws. The labor union may not be held legally responsible for or legally liable for unlawful acts committed by its officers, its agents or its members, unless it has been shown by a clear—by clear proof, that the union actually participated in or actually authorized such acts, or ratified them after having actual knowledge of them. In this regard you are instructed that before liability can be imposed upon a labor organization such as the defendant, Section 6 of the Norris-LaGuardia Act requires that the liability of labor organizations for the acts of officers, members, agents or others, be made to appear by clear proof. The act reads in this regard as follows:

" 'No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible for [sic] liable in any court of the United States for the unlawful acts of individual officers, members or agents, except upon clear proof of actual participation in or actual authorization of such acts or a ratification of such acts, after actual knowledge.'

"Thus, labor unions may not be held liable for the acts of officers or members or agents or third parties, without clear proof that the labor union actually participated, gave prior authorization or ratified such act after full knowledge of their commission. In this case, before you can find the defendant union was a member of a conspiracy or a party to any agreement or combination to violate the Sherman

Act as alleged by the plaintiff, you must find by clear proof that the union actually participated in, authorized or ratified such conspiracy, agreement or combination. In meeting the standards of clear proof, the plaintiffs are not required to satisfy the standards of proof of beyond a reasonable doubt, which is the standard of proof required in criminal cases. However, the plaintiffs may not prevail upon this issue merely by carrying the burden of proof by a preponderance of the evidence.

"By clear proof is meant the clear, unequivocal and convincing proof. In order to establish that the defendant participated in, authorized or ratified an unlawful conspiracy agreement or combination, the plaintiff must show the same by clear, unequivocal and convincing proof.

"Now, upon each and every other issue in the case, the plaintiffs are merely required to establish their claims by a preponderance of the evidence, and needs [sic] not carry the burden of proof upon such issues by clear proof as I have defined those terms." (1703a–1705a)

In connection with his charge on conspiracy the District Judge said:

"Before the jury may find that a defendant or any other person has become a member of a conspiracy, the evidence must clearly show that the conspiracy was knowingly formed * * *." (1720a).

"Whenever it clearly appears from the evidence in the case that a conspiracy existed. * * *" (1720a–1721a)

"If it clearly appears from the evidence in the case that the conspiracy alleged * * *." (1721a)

"What the evidence in the case must clearly show, before the plaintiffs are entitled to a verdict, is that the conspiracy alleged was knowingly formed and existed * * *." (1721a–1722a)

As if this were not enough, the court again repeated the clear proof rule:

"Now the defendant in this case, of course, is a labor union. A union can act only through is members, agents, including its employees and officers, therefore, in determining whether the union became a member of a conspiracy as alleged by the plaintiffs, it is necessary for you to determine whether it became a party to such a conspiracy by virtue of the acts of its agents and members, and whether or not such agents and members were acting within the scope of their authority. In other words, it must be shown to your satisfaction by clear proof that the union authorized or ratified what was done by its representatives, or acted through its authorized agents or representatives in the matters alleged. Labor organizations are relieved, under the law from liability for damages or imputation of guilt, or lawless acts done in labor disputes by some individual officer or agent or member of the organization, unless there is clear proof that the organization charged with responsibility for the offense actually participated in, gave prior authorization for or ratified such acts after actual knowledge of their perpetration.

"The United Mine Workers may be held responsible for its acts in the formation of or carrying out of a conspiracy, or during the course of a labor dispute, there must be clear proof that the particular act charged or the act generally of that type and quality had been expressly authorized or necessarily followed from a granted authority by the union, or that such act or acts were subsequently ratified by the union, after actual knowledge of its occurrence." (1722a–1723a)

All of this still did not satisfy counsel for UMW, and after the District Judge had concluded his charge and objections were made thereto, the court charged further on the subject of clear proof:

"You will recall that in instructing the jury with reference to the burden of proof, I instructed the jury that the

burden of proof rests in this case upon the plaintiffs and they are required to prove their claim by a preponderance of the evidence. I then proceeded to define the matter of preponderance of the evidence, and I further instruct you as follows. Now there is one issue in this case upon which the plaintiffs had a heavier burden than that that I have described, that is, the issue of whether the defendant actually participated in or actually authorized or ratified actions which violated the Sherman Act, or the federal laws. A labor union may not be held legally responsible for or liable for unlawful acts committed by the officers, agents, or members, unless it has been shown by clear proof that the union actually participated in or actually authorized such acts, or ratified them after having actual knowledge thereof.

"In this regard you were instructed that before liability can be imposed upon a labor organization such as the defendant in this case, Section 6 of the Norris-LaGuardia Act requires that liability of a labor organization for acts of its officers, members, or agents must be made to appear by clear proof, before the defendant could be held liable thereon. I gave you at that time further instructions as to just what was meant by clear proof, and you will bear those instructions all in mind. Then I further instructed you, 'Now upon each and every other issue in the case, the plaintiffs are merely required to establish their claims by a preponderance of the evidence and need not carry the burden upon such issue by clear proof.'

"You will bear these instructions in mind together with all of the other instructions that I have given to you upon the burden of proof in this case. Now, to the extent that the Court may have instructed you otherwise, during any portion of the case or with reference to any specific issue in the case with respect to the purpose required or imposed upon the defendant, you will disregard that previous instruction and

apply the instruction that I have now given to you, and as I have charged you originally with respect to the burden of proof." (1760a–1761a)

The plaintiffs might well have objected to the court's overemphasizing the defendant's theory of the case but in view of the verdict in their favor they were not prejudiced.

█ Other claimed errors in the court's instructions have been examined and in our judgment they do not merit discussion. We find no prejudicial error in the instructions.

### Damages

In his opinion denying the motion for a new trial, the District Court in remitting $500,000 from the verdict, fully took into account UMW's claims that causes other than its violations of the anti-trust laws may have contributed to the damage. We see no basis for reducing the verdict further.

### Did the District Court Err in Refusing to Strike the Jury Panel on the Claim That the "Key Man" System Failed to Produce a Venire Reflecting a Fair Cross-Section of the Community?

UMW raises three objections to the composition of and the method by which the jury panel was selected: (1) It contained a disproportionate percentage of salaried and management people and lacked a proportionate representation of wage earners, and thus violated 28 U. S.C. § 1864; (2) the suggesters upon whom the jury commissioners relied for names of potential jury members did not represent a fair cross-section of the community; and (3) the jury commissioners excluded potential jurors on nonstatutory bases, e. g. on the basis of arbitrary personal discretion.

The District Court considered these contentions and rejected them in a full memorandum opinion. (75a–92a). As for the first contention, the court concluded that the jury panel represented a wide assortment of occupations and

that out of 120 names, 51 could be classified as laborers. The court found that there was no evidence of systematic and intentional exclusion of any group. The court rejected the second contention, holding that there was a substantial diversity among the suggesters consulted. Furthermore, there was no requirement that suggesters be from a cross-section of the community. Again the court concluded that there was no evidence of systematic or intentional exclusion of any cognizable group of eligible citizenry. Thirdly, the court held that the jury commissioners did not exclude individuals on non-statutory grounds. The court found that the jury commissioners had to have some discretion in placing names in the jury box if they were to get a fair cross-section. In most cases, names were rejected for medical or physical reasons.

Generally, the District Court found that although the jury commissioners could improve their practice by enlarging the sector of suggesters and by selecting jurors at random from the poll lists, the abuses which were found did not rise to the level of discrimination against any group.

This Court in United States v. Hoffa, 349 F.2d 20, 30–31 (6th Cir. 1965), aff'd, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed. 2d 374 (1966), rehearing denied, 386 U.S. 951, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967), upheld the "key man" system or use of suggesters and rejected arguments similar to the ones advanced here. In Hoffa, we stated:

"While the purpose of using suggesters was to obtain an impartial jury drawn from the names of persons representing a cross-section of the community, we know of no requirement that the suggesters themselves be selected on such a basis. Nor is it necessary that every jury contain representatives of all the various classes and groups in the community. But prospective jurors shall be selected without systematic and intentional exclusion of any of the groups. The means whereby this may be accomplished rests within the sound discretion of the courts and their officers guided by statutory provisions. Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946)." (Id. at 30)

This year we again upheld the "key man" system which was attacked in three Selective Service cases on the bases of economic and racial discrimination. United States v. Mulloy, 412 F.2d 421 (No. 18,710, 6th Cir. 1969); United States v. Pratt, 412 F.2d 426 (No. 18,-709, 6th Cir. 1969); United States v. Brooks, 415 F.2d 502 (No. 18,679, 6th Cir. 1969).

UMW relies on Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966), in which the Fifth Circuit held that the clerk of the court and the jury commissioner, in compiling the jury lists, violated the federal statutory scheme by excluding jurors on the basis of intelligence, character, and ability to "understand the cases that are tried in court." The court found that the jury lists did not represent a fair cross-section of the community in that Negroes were disproportionately represented. The court held that the method utilized to select the jury panel by the jury commissioner, and suggestions by his friends, did not comply with the statutory scheme.

 In Rabinowitz, the court found that a particular definable group had been excluded. In the present case, the District Court found that no occupational or economic group had been excluded from the jury lists. The findings of the District Court are supported by substantial evidence and are not clearly erroneous.

We agree with the District Judge that there is no merit in the claim of UMW that TCC lacks standing to sue. South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir. 1966), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

Affirmed.