### Dennis Keith SHELBY

v.

### DELTA AIR LINES, INC.

No. 3–90–0945.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 20, 1993.

Charles R. Ray, Ray & Housch, Frederic Eugene Cowden, Jr., Nashville, TN, for plaintiff.

Hunter R. Hughes, III, Rogers & Hardin, Edward M. Cherof, Delta Air Lines, Inc., Law Dept., Atlanta, GA, John P. Doyle, Nashville, TN, for defendant.

## MEMORANDUM

ECHOLS, District Judge.

This case arises out of the termination of Plaintiff's employment with the Defendant. Pending before the Court is the Magistrate Judge's Report and Recommendation ("R & R") (Docket Entry No. 50), Defendant's objections thereto (Docket Entry Nos. 51, 57, and 59), and Plaintiff's reply to Defendant's objections (Docket Entry Nos. 56 and 58). Having reviewed the entire record *de novo* pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b), Fed.R.Civ.P., the Court REJECTS in part and ADOPTS in part the Magistrate Judge's recommendations and GRANTS Defendant's Motion for Summary Judgment on all of Plaintiff's claims.

## I. PROCEDURAL BACKGROUND

Plaintiff, Dennis K. Shelby, has brought suit against Defendant, Delta Air Lines, Inc. ("Delta"). Shelby has made four claims against Delta: (1) breach of employment contract; (2) breach of an implied covenant of good faith and fair dealing; (3) fraud and deceit; and (4) negligent misrepresentation. Pursuant to this Court's Order and the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Rules 302 and 303, L.R.M.P., the case was referred to the Magistrate Judge for consideration of any pretrial matters. Subsequent thereto, Delta filed a Motion for Summary Judgment seeking dismissal of all of Shelby's claims against it. The Magistrate Judge has recommended that Shelby's fraud claim be dismissed, but that the remainder of Delta's motion be denied. Delta has filed objections to the Magistrate Judge's conclusions with this Court, each of which will be addressed herein.

For the reasons more fully outlined in this Memorandum, the Magistrate Judge's R & R is hereby adopted in part and rejected in part, and this case is hereby dismissed.

## II. FACTS

On May 21, 1974, Shelby was hired by Delta as a customer service agent ("CSA") in Paducah, Kentucky. During his employment with Delta, Shelby worked in various Delta stations. From 1983 until March of 1990

when he was terminated, Shelby worked in the Nashville station where his duties included ticketing, gate, and baggage functions.

As part of the hiring process, Shelby signed an application which provided in pertinent part as follows:

If employed, in consideration thereof, and/or in consideration of the continuance thereof, and without further consideration, I do hereby agree:

. . . .

That should I be given employment either in the position applied for or any other, now or hereafter, such employment may be terminated at any time without notice or liability for wages or salary, except such earned at date of such termination, and without any other liability whatsoever . . .; That all terms and conditions of my employment, except as inconsistent with this contract or any other valid contract between Company and me (or someone legally acting on my behalf) shall be determined and governed by Company's Standard Practice Manual, as same may be amended from time to time hereafter (a copy of which, together with all amendments shall at all times be available to me); That this Agreement, including the foregoing application shall apply to all positions I may hereafter hold with Company; that upon my initial employment, and any subsequent change of my position by Company, I promptly will familiarize myself with all governmental and Company rules and regulations (including all parts of aforementioned Standard Practice Manual) applying to any positions to which I may be assigned; and it shall be sufficient cause for my discharge if I shall fail to familiarize myself with and to faithfully abide by all such rules and regulations, or by the decisions of Company or such instructions as may be given to me at any time;

. . . .

Give careful attention to all provisions of this application which, including all terms and conditions set forth herein, if accepted, constitutes a contract of employment between you and Company, all terms and conditions of employment, and all other questions arising relative to your employ-

ment, will be determined in accordance with its provisions.

Delta's Standard Practice Manual, which is incorporated into and is a part of the Delta employment contract, provides in pertinent part as follows:

*1000.1 Policy*

Just as all personnel have the right to resign their employment with Delta at any time and for any reason they choose, Delta may terminate the employment relationship with any individual at any time and for any reason if Delta concludes in its sole judgment that such termination is appropriate. This right exists notwithstanding any examples of conduct or other statements contained in Standard Practice, any personnel handbooks or any other statements of Delta's general policies. No Delta supervisory or management personnel other than the Chairman of the Board and Chief Executive Officer and the President and Chief Operating Officer are authorized to amend or modify these terms of employment.

The guidelines set forth in this standard practice are intended to provide examples of some of Delta's expectations as to conduct and appearance of Delta employees. Any list of this nature obviously cannot be all inclusive, and personnel must use their good judgment at all times. Personnel should also seek the advice of supervisors if they have any questions about particular conduct.

NOTE: For purposes of employment at Delta Air Lines, Inc., the term "permanent employee" means that the employee is filling a position deemed by Delta to be permanent. The term "permanent employee" does not mean that the individual is bound to a permanent position for his/her entire Delta career or that the employee and Delta have agreed to be parties to an employment relationship until the employee's retirement. As stated earlier, and individual may resign his/her employment with Delta at any time and for any reason he/she may deem appropriate, and Delta may terminate the employment relationship at any time if Delta concludes in its

sole judgment that an individual is not meeting Delta standards.

*1000.6 Use of Drugs*

Possession or use of cocaine, heroine, marijuana, or any hallucinogenic or illegal drug, whether or not on duty, will result in disciplinary action, including possible termination.

In 1989, pursuant to regulations promulgated under the Drug Free Workplace Act, 41 U.S.C. §§ 701–707 (1988), Delta instituted a new Anti–Drug Program. As a part of its Anti–Drug Program, Delta decided to review its longstanding policy to terminate employees involved in any way with illegal drugs. Delta's evaluation of this policy began in early 1989 and culminated with the issuance, on September 15, 1989, by Delta's Senior Vice–President of Personnel, R.H. Heil, of a two-page written memorandum to all Delta personnel concerning Delta's "Anti–Drug Program." The memorandum was posted on the employee bulletin board where Shelby worked and a copy was distributed to all Delta employees, including Shelby. The memorandum provided in pertinent part as follows:

> On March 17, 1989, we advised you that the FAA had recently set forth regulations requiring all certificated air carriers, such as Delta, to develop and implement programs to eliminate the effects of illegal drug use in the workplace. A major component of the FAA regulations involves the testing, by urinalysis, of certain groups of our personnel in the United States for the presence of illegal drugs. The FAA required drug testing must be started by all carriers no later than December 18, 1989. The purpose of this memo is to inform you about the details of Delta's substance-abuse policy, provide you with general information about the FAA requirements, and explain the steps we have taken to insure the integrity of the anti-drug program.

> *Delta's Policy*

> Historically, Delta has maintained an unwavering commitment to maintaining the very highest standards of safety in the airline industry. We have never tolerated the use of illegal drugs by our personnel, and given that drug abuse presents a discernible threat to safety, we must be committed to the prevention of illegal drug use at Delta Air Lines.

> Realistically, it is recognized that there may be some current personnel who have developed drug dependency or patterns of casual drug use which may not be easy to change. Therefore, as a prelude to implementation of the FAA mandated drug testing program, those individuals will be given a fair opportunity to correct their problems.

> Commencing September 18, 1989, and concluding on December 17, 1989, we will observe a 90–day amnesty period during which time any employee with a drug problem can *voluntarily* come forward and receive rehabilitation, counseling, or other professional assistance with the understanding that he will be returned to his present job upon successful completion of the program (and upon recertification where necessary). Individuals who come forward under this Amnesty Program will be permitted to use sick leave in order to undergo treatment and will not be subject to disciplinary action for drug usage. Individuals who choose to come forward may either contact their supervisor or our newly created Personal Assistance Programs Office. . . . Please note that the Amnesty Program does not alter in any way Delta's long-standing, absolute prohibition against the use of illegal drugs. The Amnesty Program applies only to those who *voluntarily* come forward to seek help during the 90–day period.

> The Amnesty Program will conclude on December 17, 1989. It is expected that no later than that date, any Delta employee who is an illegal drug user will have taken the necessary steps to receive medical help or other assistance and *will have ceased all use of illegal drugs. Commencing with our drug testing on December 18, 1989, there can be absolutely no tolerance for the use of unlawful substances by Delta personnel.* Thus, at the conclusion of the Amnesty Program, any employee *who is found to be using illegal drugs will be terminated.*

Two weeks after the issuance of this memorandum, Shelby was arrested at his apartment in Nashville. Shelby testified in his deposition that the arresting officer told him he was under arrest for a prior sale of cocaine he had made to an undercover informant in Clarksville, Montgomery County, Tennessee. He was then transferred to authorities in Montgomery County. On the morning following his arrest, Sunday, October 1, 1989, Shelby was scheduled to work the day shift. His wife, Tammy Shelby, called the home of one of Delta's lead agents [1] in Nashville, Ted Hackett, who was also a good friend of Shelby. She left a message on his answering machine for him to call her. Hackett testified in his deposition that he called Tammy Shelby back at about 10:30 a.m., and she told him that her husband had been arrested and was in the Montgomery County Jail. After speaking with Mrs. Shelby, Hackett testified he called the Montgomery County Sheriff's Department and was informed that Shelby had been released on bail and that he had been arrested for the possession and sale of cocaine. Later Shelby called Hackett at his home.[2] The parties dispute what was said during this phone conversation between Shelby and Hackett. Shelby testified in his deposition that he told Hackett he had a drug problem and of his arrest the previous night. Shelby claims he then asked Hackett about what his feelings were on the Delta Amnesty Program. Shelby asserts Hackett told him that because of the Amnesty Program outlined in the Anti–Drug Memo, he felt there would be no disciplinary action taken against him if he came forward voluntarily. Shelby testified that Hackett then told him he wanted to contact another lead agent and friend of Shelby's, Danny Sheehan, to discuss the situation. Shelby testified that he then proceeded to work his full shift that Sunday.

After he got home from work, Shelby testified that Hackett called and stated that he had talked with Sheehan, they both agreed that Shelby would get help through the Amnesty Program, and he would not be terminated. According to Hackett, however, Shelby never asked, nor did Hackett give him any opinion or any advice concerning Delta's Anti–Drug Program during either of their two phone conversations. Hackett also testified that Shelby had called in sick that Sunday and therefore did not work. Shelby and Hackett both testified that Shelby asked Hackett what he should do, and Hackett told him that he should report the situation to the Stations Manager, Jim Britton.

On the day after Shelby was bailed out of jail, October 2, 1989, he went to see his Stations Manager, Jim Britton. During that meeting, Shelby testified in his deposition that he informed Britton about his drug problem and his arrest. Shelby further testified he told Britton he desired to enter the Amnesty Program. Shelby testified that Britton then told him to go back to work, and Britton would call Atlanta to find out what he needed to do. Before walking out, Shelby testified that he once again stated his understanding that an Amnesty Program was in effect and of his desire to enter the program. Britton testified that he then spoke with the System Manager in Atlanta, Al Olmstead, and told him that Shelby had advised him that he had been arrested for the possession and sale of cocaine. Britton further testified that Olmstead told him to immediately suspend Shelby pending further review. In his deposition testimony, Britton denied that Shelby made any amnesty requests during either of their conversations on that day. Britton testified that Shelby also told him he had sold drugs twice, his arrest stemmed from these sales, he now had his life together after his marriage, and he was no longer using drugs. Shelby testified that about an hour after their initial conversation, Britton asked him to come into his office. Shelby testified Britton then told him that Delta

---

1. Lead agents report directly to supervisors and act as working foremen. They ensure that all positions are manned and generally address routine operational matters. However, they do not have authority to establish or define Delta policy or to make any personnel decisions such as suspensions, terminations, or hiring.

2. There is a dispute as to what time Shelby called. Shelby testified in his deposition that he was supposed to be at work by 10:00 a.m. and that he called Hackett before going in to work. Hackett maintains that Shelby did not call until around 12:00 noon.

personnel in Atlanta (corporate headquarters) had instructed him to place Shelby on immediate suspension.

On that same day, Britton sent a memo to his boss in Atlanta, E.R. Andersen, Regional Manager–Stations, advising him that Shelby had informed him that he had been indicted for possession and sale of cocaine. The memo stated further that Shelby was placed on indefinite suspension with the concurrence of System Manager, Al Olmstead. Britton concluded his memo by noting that he had notified the Corporate Security Representative, Griffin Roberts, and the Director of Equal Opportunity, Richard Ealey, of the situation, and would make him aware of further details as they became known.

On November 7, 1989, Britton sent another memo to Andersen advising him that Shelby had told him he had been indicted for possession and sale of a controlled substance and of Shelby's subsequent suspension. In the letter, Britton stated that Shelby admitted to him that he had purchased cocaine and delivered it to an acquaintance on two occasions as a favor and not for profit. Britton also stated Shelby had told him his lawyer was trying to work out a pretrial diversion program. Britton stated further that Shelby had been with Delta for over fifteen years, and he was an above-standard employee. Britton ended this letter by noting the seriousness of the situation and requesting guidance in the matter.

Following the suspension, the case was then reviewed by management in the Corporate Stations Department and by Delta's Equal Opportunity Office. On November 14, 1989, Ealey decided to terminate Shelby immediately. However, the decision to terminate Shelby apparently was not properly communicated to the Regional Manager in Stations, E.R. Andersen. As a result, instead of advising the Nashville Station Manager to terminate Shelby, Andersen proceeded on the assumption that Delta would wait until the disposition of the Tennessee criminal proceedings before making a final employment decision on Shelby. Consequently, Shelby was left on suspension.

On December 19, 1989, while he was on suspension, Shelby sent a letter to Delta requesting reinstatement. The letter, however, made no reference to Delta's Anti–Drug Program. On March 16, 1990, Shelby sent Britton a copy of the memorandum of understanding which he had entered into with the prosecuting authorities in Montgomery County, Tennessee. Britton forwarded the document to Mark Baxter of Delta's Equal Employment Opportunity office. The memorandum provided that Shelby would be subjected to a pretrial diversion program. Specifically, the memorandum provided that the charges against Shelby would be dismissed upon his compliance with the conditions of the agreement. At this point, the earlier communications breakdown was discovered. On March 21, 1990, Britton was expressly advised by Andersen to terminate Shelby. Britton then called Shelby and asked him to come in, but Shelby requested that Britton inform him of the decision by phone. Britton testified that he first requested that Shelby resign, but Shelby refused. Shelby refused to resign his position. At that point, Britton terminated Shelby.

On March 27, 1990, Shelby wrote to R.H. Heil, author of the Anti–Drug Memo. Shelby specifically stated in this letter that the Amnesty Program was the deciding factor in his decision to advise Delta of his drug problem, and his suspension was contrary to the Amnesty Program as described in the memorandum.[3] In response to Shelby's letter, Heil advised Shelby that the reason for his termination was due to the fact that he had been convicted and fined for the possession of a controlled substance. Heil advised Shelby that Delta's policy was to immediately terminate any Delta employee arrested or convicted of possessing a controlled substance. Heil further advised Shelby that these employees were not eligible for the Amnesty Program. Shelby responded by letter stating that he had not been convicted or fined of possessing a controlled substance,

---

3. On that same date, Shelby was arrested in Kentucky for the possession and sale of illegal drugs. Shelby eventually pled guilty to this charge and was sentenced to five years which was reduced to probation.

and therefore was entitled to participate in the Amnesty Program. By letter, Heil informed Shelby that, regardless of whether he had technically been convicted, it was clear that he had been found in possession of an illegal substance which constituted conduct unbecoming of a Delta employee rendering him ineligible for the Amnesty Program. Shelby filed this suit shortly thereafter.

## III. DISCUSSION

Federal Rules of Civil Procedure 56(c) provides that summary judgment "shall be rendered ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In responding to a motion for summary judgment, the nonmoving party cannot rest on its pleadings, but must present some specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

A dispute about a material fact is "genuine" within the meaning of Rule 56(c) only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient. *Id.* at 251, 106 S.Ct. at 2511. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. at 2510–11. Of course, the Court must construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513. The Court will now address the Defendant's Motion for Summary Judgment, as well as each parties' arguments relative thereto, in light of this standard.

## A. Breach of Contract Claim

### 1. *Contentions of the Parties*

Shelby contends Delta's termination of him despite the existence of the Anti–Drug Program constituted a breach of the parties' contract for which he is entitled to damages. The parties do not dispute that, when originally hired by Delta, Shelby was an at-will employee, who could be discharged for any reason or no reason at all. Shelby contends, however, that his employment-at-will status was abrogated by Delta's issuance of its Anti–Drug Memorandum. Specifically, Shelby contends that Delta's Anti–Drug Memorandum created a contractual obligation on its part which prevented it from suspending or terminating him for drug use if he chose to participate in the Anti–Drug Program.

Delta has moved for summary judgment dismissal of Shelby's breach of contract claim. First, Delta contends that Shelby entered into a written employment contract for an indefinite term. As a result, Shelby's employment relationship with Delta was at-will, and, therefore, Delta could terminate for any reason or for no reason at all. Delta asserts that Shelby's "at-will" status was specifically confirmed as well by language found in his employee handbook, the express terms of which could not be amended or modified except by the Chairman of the Board, the Chief Executive Officer, the President, or the Chief Operating Officer. Thus, Delta asserts that as a matter of both common law *and* express contractual agreement, it was legally entitled to sever its employment relationship with Shelby at any time for any or no reason.

Next, Delta argues that, even if this Court should find that the Anti–Drug Memorandum became a part of the employment contract, under Tennessee state law, Delta's right to terminate Shelby under the at-will doctrine would not be affected by the Memorandum's inclusion into the parties' contract. This assertion is based upon Delta's contention that, under Tennessee law, the employer's rights to terminate an at-will employee are *only* affected by amendments to the parties' contract which deal specifically with the term or duration of the employee's employment. In this case, Delta asserts that any purported amendments to the contract made by the

Anti–Drug Memo did not have any affect on the term of Shelby's employment. Therefore, Delta asserts that Shelby could be terminated for any or no cause at any time.

Alternatively, Delta contends that, even if this Court should find that the Anti–Drug Memorandum became a part of the employment contract, and additionally finds that Tennessee's employment-at-will rule does not bar Shelby's breach of contract claim, nevertheless, Shelby's termination was proper because he was not eligible for participation in the program. First, Delta argues that the Amnesty Program was available only to those employees who used drugs personally, and not to those who were also dealers or to those who had been arrested and convicted of any crimes involving drugs. Since Shelby was not a mere drug user but also a drug dealer, he was not eligible to participate in the Anti–Drug Program and could, therefore, be terminated. Second, Delta asserts Shelby was not eligible for the Anti–Drug Program because he did not "voluntarily" come forward as required by the provisions of the Anti–Drug Memo. Since Shelby was not eligible to participate in the Anti–Drug Program, Delta's termination of him, despite the existence of the Anti–Drug Program, did not constitute a breach of the parties' contract.

In response, Shelby argues that Tennessee courts have recognized that, even though the term of an employment contract is indefinite, that fact alone does not preclude its modification. Under Tennessee law, what would otherwise be an at-will contract may be modified by specific language which evidences an intent to modify the existent employment contract. Shelby alleges that the language of the Anti–Drug Memo could be interpreted by a reasonable person as showing contractual intent to modify the parties' employment contract. Further, Shelby asserts that a material issue of fact exists regarding whether he was eligible for the Amnesty Program since the memo did not expressly and specifically exclude those who made casual sales of drugs incident to their own personal use, or those who had been arrested for possession. Shelby contends that a reasonable person could construe the memo in such a way as to apply to his situation. As such, a reasonable person could conclude that Delta breached their contract by terminating him in violation of the provisions of the memo.

### 2. Analysis

The parties do not dispute that initially Shelby was an employee at will under both the common law, since he was not hired for any definite time period, and under the express provisions of the employment application which by its own terms became a part of the employment contract. Further, the parties do not dispute that the longstanding rule in Tennessee is that an employee at will may be discharged without breach of contract for good cause, bad cause, or no cause at all, without being liable for any legal wrong. *Harney v. Meadowbrook Nursing Center,* 784 S.W.2d 921, 922 (Tenn.1990); *Chism v. Mid–South Milling Co.,* 762 S.W.2d 552, 555 (Tenn.1988).

Shelby contends, however, the Anti–Drug Memo modified his employment contract. Delta denies this. Therefore, the Court must first decide whether the Memo became a part of Shelby's employment contract. If it did not, then Shelby cannot sue under a breach of contract theory.

Tennessee courts have recognized that an employee handbook may, under certain circumstances, become a part of the contract of employment between the employee and the employer. *Davis v. Conn. Gen. Life Ins. Co.,* 743 F.Supp. 1273, 1278–1279 (M.D.Tenn.1990) (*citing Hamby v. Genesco, Inc.,* 627 S.W.2d 373 (Tenn.Ct.App.1981)); *see also Williams v. Maremont Corp.,* 776 S.W.2d 78, 80 (Tenn.Ct.App.1988). The determination of whether an employee handbook is deemed to be part of the employment contract depends upon the specific language of the handbook. *Davis,* 743 F.Supp. at 1279; *MacDougal v. Sears, Roebuck & Co.,* 624 F.Supp. 756, 759 (E.D.Tenn.1985). In Tennessee, the language of an employee handbook or manual does not create a guaranteed contract right unless the language manifests contractual intent on the employer's part or expressly states that the policy included therein is guaranteed. *Wilmer v. Tenn. Eastman Co.,* 919 F.2d 1160, 1163 (6th Cir.1990). These principles should also gov-

ern the determination of whether a memo distributed company wide should be deemed to have amended an employment contract. Given that all evidence and all inferences must be viewed in a light most favorable to Shelby, the Court finds that a reasonable person could conclude that the language of the Anti–Drug Memo manifested a contractual intent on Delta's part not to discipline those employees with a "drug problem" who voluntarily came forward and sought amnesty during the ninety-day period.

■■■ The Court also finds that a genuine issue of material fact exists as to whether or not Shelby was eligible for the Amnesty Program. Ordinarily, the ascertainment of the intention of the parties to a written contract is a question of law for the court to decide when the language of the contract is plain, simple, clear, and unambiguous. *Hamblen County v. City of Morristown,* 656 S.W.2d 331, 334–35 (Tenn.1983); *Taylor v. Universal Tire, Inc.,* 672 S.W.2d 775, 777–78 (Tenn.Ct. App.1984). However, if the language of the contract is ambiguous, then the meaning of the terms used becomes a factual question to be decided by the trier of fact. *Tennessee Consol. Coal Co. v. United Mine Workers of Am.,* 416 F.2d 1192, 1198 (6th Cir.1969). Whether the terms of the contract are ambiguous is a question of law for the court to determine. *Id.*

In this case, the Court finds the Memo to be ambiguous as to what conduct was covered and not covered by the Amnesty Program. It appears to the Court that the Memo was directed solely to users and not dealers. The Memo makes reference at least eight times to drug "usage" or drug "use." On whole, the tenor of the Memo appears to address only those employees who have a "drug use" problem. However, there is a reference in the Memo to "drug problem," although the Memo does not contain a definition of "drug problem." Further, the Memo does not contain any listing of specific conduct excluded from the Amnesty Program. The Court finds that the Memo could be construed by a reasonable person as including limited, casual exchanges or sales of drugs among friends incident to their use of the drugs. Therefore, the Court believes that, viewing the language of the Memo in a light most favorable to Shelby, a reasonable person could interpret the Memo to cover those who admittedly made casual exchanges or sales of drugs in addition to their using drugs.

It should also be noted that there is a genuine issue of material fact as to the exact nature of Shelby's sales, i.e., whether he sold drugs for profit or whether they were just casual exchanges, and how often he sold drugs. Furthermore, a reasonable person could interpret the Memo as covering those who have been arrested or even convicted for the simple possession and/or sale of drugs since the Memo did not specifically exclude employees who have been arrested or convicted for such criminal violations. Delta has argued that it could not have possibly listed all of the activities, or conduct, or crimes which would have excluded employees from the Amnesty Program. The Court finds, however, that in order to have avoided the present situation, Delta would not have been required to issue an exhaustive laundry list of conduct not covered by the Amnesty Program. Any such listing would have only had to include those specific activities which a reasonable person might consider as covered under the Amnesty Program. Other drug related "problems" would unquestionably not be covered by the Amnesty Program. For example, a reasonable person could not interpret the Memo as covering an assault, robbery, or murder committed during a sale or the use of drugs or in pursuit of funds to purchase drugs.

The Court also finds that there is a genuine issue of material fact as to whether Shelby "voluntarily" came forward. Shelby testified that when he called Hackett and when he went to see Britton, he affirmatively stated his desire to enter the Amnesty Program. Both Hackett and Britton deny this and Delta contends that Shelby's actions can hardly be said to have been voluntary given his arrest.

■■■ Having found that the Anti–Drug Memo became a part of the contract and that Shelby has made out a factual issue with regard to his eligibility for the Amnesty Program, it remains for the Court to determine

what effect, if any, Tennessee's employment-at-will doctrine has on Shelby's breach of employment contract claim. Delta maintains that under Tennessee law, where an at-will employment relationship exists, the right of either party to terminate the relationship is not affected by contract amendments that leave the *term* of the employment agreement indefinite. Delta asserts this is true even where the claimed amendment includes a provision that purportedly limits the circumstances in which the employee may be terminated. Delta relies on three cases in support of its contentions: *Crigger v. Columbia Power and Water Sys.*, No. 01–A–01–9001–CV00036, 1990 WL 121570, at *1· (Tenn.Ct. App. Aug. 24, 1990); *Bringle v. Methodist Hosp.*, 701 S.W.2d 622 (Tenn.Ct.App.1985); and *Graves v. Anchor Wire Corp. of Tenn.*, 692 S.W.2d 420 (Tenn.Ct.App.1985). Delta asserts that each of these cases hold that the controlling issue is whether the contract has been amended to establish a definite durational term. If it has not, then each party maintains the mutual right to terminate the relationship for any reason.

In *Graves*, 692 S.W.2d at 420, the plaintiff was an employee hired for an indefinite term and was, therefore, admittedly an employee at will. Shortly after she began work, the defendant employer furnished her with an employee handbook outlining company policies, benefits, rules, and regulations, which included a section on employee discipline and discharge. The plaintiff was fired after she removed some important records from her employer's office. After her dismissal, the plaintiff brought an action against her employer for wrongful discharge, claiming that the handbook became a part of her employment contract and that it restricted her employer's right to terminate her. The trial court dismissed plaintiff's suit on the employer's motion for summary judgment.

On appeal, the Tennessee Court of Appeals addressed the issue of "[w]hether the employee handbook ... created an implied contract of employment thereby altering [plaintiff's] status as an employee at will." *Graves*, 692 S.W.2d at 421. In affirming the trial court's dismissal, the court stated:

[A]ssuming arguendo that the handbook furnished to Graves created an implied contract of employment, we agree with Graves' statement in her brief that it created an "implied contract of employment for an *indefinite* term."

The law is well established in this state that a contract for employment for an *indefinite* term is a contract at will and can be terminated by either party at any time without cause.... There has never been any contention on the part of Graves that she was hired for any definite term and there is no dispute as to any material fact in regard to the term of employment. In view of the facts of this case, we can only assume that Graves is seeking for this Court to change the well-established law in the state concerning contracts of employment terminable at will. To respond to this assertion, we adopt the statement of Judge Conner in *Whittaker v. Care–More, Inc.* [621 S.W.2d 395 (Tenn.Ct.App.1981) ]:

It is not the province of this court to change the law as plaintiffs assert. That prerogative lies with the supreme court or the legislature. However, based upon our review of this area of the law we are compelled to note that any substantial change in the "employee-at-will" rule should first be microscopically analyzed regarding its effect on the commerce of this state. There must be protection from substantial impairment of the very legitimate interests of any employer in hiring and retaining the most qualified personnel available or the very foundation of the free enterprise system could be jeopardized.

*Graves*, 692 S.W.2d at 422 (citations omitted).

In *Bringle*, 701 S.W.2d at 622, the plaintiff employee was discharged and sued her former employer for, among other things, breach of contract. While employed, she had been issued an employment handbook which described general procedures for grievances, and the rights and benefits of employees. The handbook did not, however, provide any assurance of employment for any definite time. The plaintiff asserted the handbook became a part of her contract, and she could not be discharged without cause. The em-

ployer argued that plaintiff was an employee at will and could be discharged without cause at any time. The trial court granted summary judgment for the employer and the plaintiff appealed. The Tennessee Court of Appeals affirmed the trial court and stated:

> It is clear that the employee handbooks did not create any employment contract for a definite term. Even if it was conceded that the handbooks established an employment contract, the contract would be for an indefinite term. Plaintiff has never contended that she was hired for any definite term and there is no dispute as to any material fact in regard to the term of employment. The law is well established in this state that a contract for employment for an indefinite term is a contract at will and can be terminated by either party at any time without cause.

*Bringle*, 701 S.W.2d at 625 (citations omitted).

In *Crigger*, 1990 WL 121570 at *1 (Tenn. Ct.App. Aug. 24, 1990), the plaintiff was hired for an indefinite term and was, therefore, an employee at will. Several years later the defendant company issued an employment manual which contained express language which prohibited the company from terminating an employee without reasonable cause. After being fired, the plaintiff brought suit alleging the manual constituted an employment contract which the company had breached. The Tennessee Court of Appeals dismissed plaintiff's claim and cited to *Graves* and *Bringle*. *Crigger*, 1990 WL 121570 at *3–4 (Tenn.Ct.App. Aug. 24, 1990).

Shelby has cited to *Wilmer v. Tenn. Eastman Co.*, 919 F.2d 1160 (6th Cir.1990), *Davis v. Conn. Gen. Life Ins. Co.*, 743 F.Supp. 1273 (M.D.Tenn.1990), *Williams v. Maremont Corp.*, 776 S.W.2d 78 (Tenn.Ct.App.1988), and *Hamby v. Genesco, Inc.*, 627 S.W.2d 373 (Tenn.Ct.App.1981) in support of its position. The Court will address each of these cases in turn.

In *Hamby*, a number of employees filed suit against their employer, alleging that they were entitled to compensation because their employer had not complied with certain procedures concerning job certification, seniority, "roll-down rights," and the payment of guaranteed employment hours as set forth in an employees' handbook which they allege was part of their employment contract. *Hamby*, 627 S.W.2d at 374. The defendant employer denied the handbook was part of the employment contract. *Id.* The Tennessee Court of Appeals affirmed the trial court's finding that the handbook became a part of the parties' contract. *Id.* at 376.

It is noteworthy that *Hamby* only dealt with the issue of whether a handbook can be deemed a part of an employment contract. Without discussion, the Tennessee Court of Appeals concluded that the Chancellor had correctly determined that the handbook was a part of the contract. *Id.* at 376. Subsequent courts have relied upon *Hamby* to support their finding that an employment contract may be amended by an employee handbook in certain circumstances. As the Court has already noted above, that proposition appears to have now become firmly established in Tennessee. However, the issue presently before this Court was not precisely addressed in the *Hamby* decision. Nowhere did *Hamby* discuss or even mention Tennessee's employment-at-will doctrine and its effect on a purported amendment to an employment at-will contract by an employee handbook. Further, the disgruntled employees in that case were laid off, not discharged.

Shelby has also cited to and relied most heavily on *Williams v. Maremont Corp.*, 776 S.W.2d at 78. In *Williams*, former employees of Maremont sued for breach of their employment contracts. *Id.* at 79. All of the employees were hired for indefinite terms. *Id.* Each employee was provided with an employee handbook which stated that employees who had been laid off would be recalled by the employer in the order of their seniority. *Id.* In September 1985, the plaintiffs were released. *Id.* The plaintiffs alleged they were told that they were being laid off. *Id.* at 79–80. Maremont asserted the plaintiffs were told they were being permanently discharged, and they would not be recalled according to seniority. *Id.* at 79. In early 1986, Maremont began rehiring some of the employees previously released in September, 1985, and also hired some new employees. *Id.* None of the plaintiffs, who had

six to nine years seniority and who would have been entitled to increased employment benefits after ten years of service, were re-hired. *Id.* The plaintiffs brought suit alleging Maremont had breached the employment contract by failing to follow the seniority recall provisions of its employee handbook. Maremont moved for summary judgment asserting plaintiffs were employees at will and, thus, had no enforceable right of recall according to their seniority. The trial court granted Maremont's motion, and the plaintiffs appealed. The Tennessee Court of Appeals reversed and stated:

> As a general rule "[t]he law is well established in this state that a contract for employment for an *indefinite* term is a contract at will and can be terminated by either part[y] at any time without cause...." The mere lack of definite durational term, however, does not prohibit the existence of other terms to the contract. For instance, parties typically agree on other terms of employment, such as wages and hours, without regard to the lack of a specific durational term.

*Williams,* 776 S.W.2d at 80. The court then noted that an employee handbook may become a part of the contract of employment and cited to *Hamby v. Genesco, Inc. Williams,* 776 S.W.2d at 80. The court then stated further:

> The terms of the employee handbook here are clear. It states that "employees *will* be recalled in the order of seniority." (emphasis added). Maremont asserts that because it is free under the doctrine of employment at will to terminate any of its employees at any time, its promise in the employee handbook is mere *nudum pactum*—a naked agreement unenforceable at law. We do not agree.
>
> Maremont contractually bound itself to lay off and rehire Plaintiffs in order of seniority. Maremont's promise of seniority-based job recall, together with increased benefits after ten years of employment, was clothed in the consideration of improved stability of the work force and better cooperation between management and the employees. Maremont was not obligated to create its seniority policy, but

> having done so to the detriment of those relying on the policy, it may not now treat its promise as an empty one.
>
> Maremont argues that its promise is unenforceable "because there is no way to fashion a remedy for the breach." It asserts that the remedies of damages and specific performance are inappropriate because there is no basis for assessing damages or ordering reemployment because theoretically the employer could terminate at will immediately upon rehiring Plaintiffs.
>
> The remedy of specific performance may not be available but damages may be recovered for breach of contract. This contract, as all contracts, impliedly provides for good faith and fair dealing between the parties. *Gibson's Suits in Chancery,* 6th Edition, § 34. All parties are bound by law "to act in word and deed, in a responsible manner" and the trier of fact in assessing damages would hold the parties to this standard.
>
> We think that under the record before us, the affidavit of Maremont to the motion and the affidavits of Plaintiffs to the response raise a genuine issue of material fact—the issue of whether the Plaintiffs were permanently terminated or temporarily laid off. This genuine issue of material fact renders summary judgment inappropriate in this case.

*Williams,* 776 S.W.2d at 80–81.

Shelby contends that *Williams* stands for the proposition that a policy statement that does not affect the durational terms of an at-will employment contract may nevertheless prevent an employer from exercising its at-will rights. The Court believes Shelby's reliance on *Williams* is misplaced.

*Williams* expressly distinguishes between an employer's right to terminate an at-will employee and *other* terms of employment. *Williams* does not hold that handbook statements may limit the right of an employer to terminate an employee at will, but rather that an employer is contractually bound by statements which amount to unequivocal guarantees of conditions of employment "other" than those which relate to the right of either party to terminate their relationship—in that case, an employee's right to be re-

called after layoff in order of seniority. Where, as in the present case, the duration of the employment contract is not put at issue by the purported amendment, then the right of the employer to terminate the employment-at-will relationship for any or no reason will override any inconsistent term of the purported amendment. If the purported amendment addresses issues regarding the terms and conditions of employment other than termination, such as recall rights, vacation pay, or pension benefits, then such an amendment may be given full force and effect since it would not be inconsistent with the employer's at-will rights.

In essence, the Court reads *Williams* as holding that a genuine issue of material fact existed as to whether the employees had in fact been permanently terminated or temporarily laid off. If found to have been terminated, judgment for the employer would have been appropriate. If found to have been merely laid off, the employer would be required to abide by the handbook provisions which contractually bound the employer as to "other" terms of employment which did not speak to an employer's right to terminate an employee at will.

The Court additionally finds that Shelby's reliance upon the Court's decision in *Davis v. Conn. Gen. Life Ins. Co.*, 743 F.Supp. 1273 (M.D.Tenn.1990) is likewise misplaced. In *Davis*, a discharged employee sued his employer for, among other things, breach of contract. The plaintiff asserted that several provisions of an employee handbook, if read in conjunction, transformed his employment from that of an indefinite term employee who may be fired at will to a definite term employee who may be fired only at the end of the term or for cause during the course of the term. The employer filed a motion for summary judgment. The court found that the handbook could become a part of the employment contract. *Id.* at 1278. However, the court found that the language of the employee handbook did not provide a specific and definite term of employment and, thus, the employer was free to fire the plaintiff at will for good cause or no cause. *Id.* at 1281.

Finally, Shelby has cited to *Wilmer v. Tenn. Eastman Co.*, 919 F.2d 1160 (6th Cir. 1990). However, like *Davis, Wilmer* is of no help to Shelby. In *Wilmer*, the discharged plaintiff sued his former employer under a breach of contract theory. The district court granted summary judgment for the employer, and the employee/plaintiff appealed. The issue addressed by the Sixth Circuit Court of Appeals was whether the equal employment opportunity provisions of an employee manual or employer-posted policy statements regarding nondiscrimination created a contractual guarantee that employees would not be terminated on the basis of their race. The court concluded that the handbook provisions and the posted policy statements did not create a contract standing alone because they failed to manifest any contractual intent and included no guarantees. *Id.* at 1163. The court did not, however, address the issue of whether the at-will nature of an employment relationship could be modified by a policy statement that failed to set a fixed term of employment.

■ Based on the analysis of the cases above, the Court finds that under Tennessee law, where the duration of the employment contract is not put at issue by a purported amendment, and in the absence of any public policy exception, then the right of the employer to terminate an at-will employee for any or no reason will override any inconsistent term of the purported amendment. This determination does not end the Court's inquiry in this case, however, because the Court must now determine whether the Anti–Drug Memo could be construed by a reasonable person as creating a fixed term of employment. If not, then no genuine issue of fact exists as to the meaning of the Memo on this issue, and therefore summary judgment for Delta would be appropriate.

The Court finds no language in the Memo which a reasonable person could construe as creating any fixed term of employment. The Memo simply does not address that issue in any way. In *Whittaker v. Care–More, Inc.*, 621 S.W.2d 395 (Tenn.Ct.App.1981), the plaintiffs claimed that the language of an employee handbook implied a specific term of employment. The handbook stated:

> An employee may reasonably expect uninterrupted employment year in and year

out. Any employee doing his work in a satisfactory manner and working for the good of the organization has little to fear about job security.

*Id.* at 397. The Tennessee Court of Appeals held that such language did not entitle the plaintiff to a specific term of employment because there were no guarantees or binding commitments contained therein. *Id.* The same may be said of the present case. Further, the Memo must be read in conjunction with the express language of the employment application and the Standard Practice Manual incorporated into the employment contract, which provided that, regardless of any conduct or statements of Delta, it had the right to terminate the employment relationship with Shelby at any time and for any reason.

Since there are no genuine issues of material fact as to whether Shelby was an employee at will and since the Memo did not provide a definite term of employment, the Court GRANTS Delta's Motion for Summary Judgment on Shelby's breach of contract claim.

## B. Breach of Implied Covenant of Good Faith and Fair Dealing Claim

### 1. *Contentions of the Parties*

■ Shelby has alleged a claim for breach of an implied covenant of good faith and fair dealing. Shelby alleges that Delta's conduct in terminating him was not fair, and that Delta acted in bad faith by violating Delta's alleged promise that, if employees who had developed drug dependencies or patterns of casual drug use and who voluntarily admitted such to Delta during the amnesty period, they would not be disciplined.

Delta asserts that Tennessee law does not recognize a claim for breach of an implied covenant of good faith and fair dealing in the employment context. Further, Delta asserts that, even if Tennessee does recognize such an action, in this case there is no factual basis to support Shelby's claim. Also, Delta contends that the express terms of the employment agreement between Shelby and Delta allowed Delta to terminate Shelby with or without cause. Therefore, Delta asserts this claim attempts to create an implied covenant that is inconsistent with the express terms of Shelby's employment which is not allowed under the law.

In response, Shelby asserts that the concept of a covenant of good faith and fair dealing in an employer/employee relationship has been expressly recognized by the Tennessee courts. Shelby contends that whether it was reasonable for Delta to have terminated him under the circumstances is a factual question which precludes summary judgment dismissal of his claims.

### 2. *Analysis*

The parties have primarily relied on two cases: one from the Middle Section of the Court of Appeals of Tennessee, and the other from the Eastern Section of the Court of Appeals of Tennessee. Neither party has suggested nor furnished the Court with any Tennessee Supreme Court authorities on this issue and the Court has found none on its own.

Delta relies upon *Whittaker v. Care–More, Inc.,* 621 S.W.2d 395 (Tenn.Ct.App.1981). In *Whittaker,* plaintiffs who were terminated filed suit against their employer alleging that they had been discharged without good cause, and that their employer had breached implied contracts for indefinite terms. The employment applications completed by the plaintiffs provided that, after a trial period of employment, employees could be terminated at will upon a two-week notice from one party to the other. The plaintiffs alleged that a provision in an employee handbook implied a specific term of employment. The provision relied upon stated: "[a]n employee may reasonably expect uninterrupted employment year in and year out. Any employee doing his work in a satisfactory manner working for the good of the organization has little to fear about job security." The trial court granted summary judgment for the employer. On appeal, plaintiffs challenged the validity of the employee-at-will rule. The Tennessee Court of Appeals held that in view of the employment application providing that, after a trial period, employment might be terminated by either party at will upon a two-week notice, the employees were not entitled to specific terms of employment despite the handbook provision quoted above.

Apparently, the plaintiffs argued that, in any contract of employment, there is an implied covenant of good faith and fair dealing. In rejecting this theory, the court stated:

> The theory of bad faith is that in any contract of employment there is an implied covenant of good faith and fair dealing and that termination not made in good faith constitutes a breach of contract. (citation omitted) Few courts have accepted this concept.
>
> It is not the province of this court to change the law as plaintiffs assert. That prerogative lies with the supreme court or the legislature. However, based upon our review of this area of the law we are compelled to note that any substantial change in the "employee-at-will" rule should first be microscopically analyzed regarding its effect on the commerce of this state. There must be protection from substantial impairment of a very legitimate interest of an employer in hiring and retaining the most qualified personnel available or the very foundation of the free enterprise system could be jeopardized.
>
> Professor Blades clearly recognized the danger for abuse resulting from a weakening of the "employee-at-will" rule when he wrote:
>
> > [T]here is the danger that the average jury will identify with, and therefore believe, the employee. This possibility could give rise to vexatious lawsuits by disgruntled employees fabricating plausible tales of employer coercion. If the potential for vexatious suits by discharged employees is too great, employers will be inhibited in exercising their best judgment as to which employee should or should not be retained.... [T]he employer's prerogative to make independent, good-faith judgments about employees is important in our free enterprise system. 67 Colum.L.Rev. 1404, 1428 (1967).
>
> Tennessee has made enormous strides in recent years in its attraction of new industry of high quality designed to increase the average per capita income of its citizens and thus, better the quality of their lives. The impact on the continuation of such influx of new businesses should be carefully considered before any substantial modification is made in the employee-at-will rule.

*Whittaker,* 621 S.W.2d at 396–97.

Shelby relies upon *Williams v. Maremont Corp.,* 776 S.W.2d 78 (Tenn.Ct.App.1988). In *Williams,* the plaintiffs were all former at-will employees of the defendant. An employee handbook provided that in the event of layoffs, recalls of those employees who had been laid off would be according to seniority with the most senior employee recalled first. There was a dispute as to whether these plaintiffs were terminated or were laid off. At any rate, the defendant, at a later date, began to rehire some of the employees that had been laid off, and also began to take on new hires. The plaintiffs were not rehired, and they sued contending that the portion of the handbook noted above was an implied contract, and that since they had been laid off, they were entitled to recall under the policy stated in the handbook. The trial court granted the defendant's motion for summary judgment on the theory that the plaintiffs were all employees at will and could be terminated at any time with or without cause. In reversing, the Court of Appeals, after noting that the portion of the handbook noted above was to be considered an implied contract and there was a factual dispute as to whether the plaintiffs were terminated or laid off, stated "this contract, as all contracts, impliedly provides for good faith and fair dealing between the parties." *Id.* at 81. As authority for this proposition, the court simply cited *Gibson's Suits in Chancery,* 6th Ed., Sec. 34. *Id.* at 81.

■ In a diversity case, where there is no definitive state decision on the issue at hand, the Court must predict how the court of last resort will act if presented with the issue. *Filley v. Kickoff Publishing Co.,* 454 F.2d 1288, 1291 (6th Cir.1972); *Tenn. River Pulp & Paper Co. v. Eichleay Corp.,* 708 F.2d 1055, 1057 (6th Cir.1983). In making its prediction, the Court may rely upon all available data, including "the decisional law of the state's lower courts, restatements of the law, law review commentaries, and decisions from other jurisdictions on the 'majority' rule...."

*Grantham and Mann, Inc. v. Amer. Safety Prod., Inc.,* 831 F.2d 596, 608 (6th Cir.1987).

In the present case, the Court believes that when presented with the issue, the Tennessee Supreme Court will conclude that at-will employment contracts will not be encumbered with an implied covenant of good faith and fair dealing.

The Court believes the Plaintiff's reliance on *Williams* is misplaced. In the Court's opinion, the language in *Williams* referring to good faith and fair dealing was only meant to apply to the provisions of the contract dealing with recall rights. If it were determined that the plaintiffs in that case were merely laid off rather than permanently discharged, then Maremont Corporation was under an obligation to exercise good faith and fair dealing in relation to its laid off employees regarding the handbook provisions dealing with recall rights. But if the plaintiffs were discharged, there was no implied obligation of good faith and fair dealing.

Even if the *Maremont* case is read to hold that a duty of "good faith and fair dealing" is implied in all at-will employment contracts, the *Whittaker* case has specifically rejected this concept. The only authority cited by the *Maremont* court is *Gibson's Suits in Chancery.* Although this noted treatise is well respected, it is a very slim reed on which to rest a major restructuring of the employment relationship.

Further, the *Williams* Court's statement noted above was not necessary to the determination of that case. All the court needed to do there was to note that the policy stated in the handbook with respect to recall of laid-off employees was an implied contract and that there was a factual dispute as to whether these plaintiffs were terminated or were laid off. If they were terminated, they had no lawsuit; if they were laid off, they had a right under the employment contract to be recalled. Also, it does not appear that the parties in *Williams* fully briefed and argued this issue to the court. Otherwise, it seems reasonable to assume that the opinion in *Williams* would have discussed *Whittaker* to some extent. *Whittaker* was cited in the court's opinion in *Williams,* but only in support of the general proposition that employ-ment contracts without a stated term of employment are at-will contracts.

Finally, if Tennessee courts were to follow a reading of *Maremont* such that an implied covenant of good faith and fair dealing applies to an otherwise terminable-at-will contract, the at-will doctrine could be completely destroyed. Determining whether an employer exercised good faith and fair dealing when it discharged an at-will employee will almost always be subject to the discretion of the courts or a jury.

Therefore, the Court GRANTS Delta's Motion for Summary Judgment on Shelby's breach of an implied covenant of good faith and fair dealing.

## C. Fraud and Deceit Claim

Shelby has also alleged a cause of action for fraud and deceit. As already noted, the Magistrate Judge concluded that Shelby's fraud claim is subsumed in his contract claim. As the Magistrate Judge stated, under Tennessee law, mere allegations that a contract was breached tortiously, negligently and/or willfully do not give rise to an action in tort. *See Becker v. Celebration, Inc.,* 541 F.2d 156, 157 (6th Cir.1976); *Mid–South Milling Co. v. Loret Farms, Inc.,* 521 S.W.2d 586, 588 (Tenn.1975); *Perryman v. Peterbilt,* 708 S.W.2d 403, 406 (Tenn.Ct.App.1985). The Court agrees with the Magistrate Judge's conclusion. Further, an action for fraud requires a showing of scienter or intent. The plaintiff must present some evidence that the defendant made a false representation of an existing or past material fact and that the false representation was made knowingly without belief in its truth or with a reckless disregard for the truth. *See Maddux v. Cargill, Inc.,* 777 S.W.2d 687, 691–692 (Tenn. Ct.App.1989); *Pusser v. Gordon,* 684 S.W.2d 639, 641 (Tenn.Ct.App.1984). In this case, the Court finds no evidence of scienter or intent on Delta's part.

Moreover, Shelby's counsel has not objected to the Magistrate Judge's recommendation dismissing this claim. Also, Shelby's counsel agreed at oral argument that this claim should be dismissed. Accordingly, the Court ADOPTS the Magistrate Judge's recommendation and GRANTS Delta's Motion

for Summary Judgment with respect to Shelby's fraud and deceit claim.

### D. Negligent Misrepresentation

#### 1. *Contentions of the Parties*

█ Shelby has also asserted a claim under a theory of negligent misrepresentation. Delta contends that Tennessee does not recognize a cause of action for negligent misrepresentation in the employer/employee context, but only with regard to commercial transactions. Alternatively, Delta argues that even if Tennessee does recognize such an action in this situation, Shelby has not presented evidence to establish the elements for such an action.

#### 2. *Analysis*

Tennessee has adopted the definition of negligent misrepresentation found in the Restatement of Torts (Second) § 552 (1977). *See Tartera v. Palumbo,* 224 Tenn. 262, 453 S.W.2d 780, 784–785 (1970); *see also Marshalls of Nashville v. Harding Mall,* 799 S.W.2d 239, 242 (Tenn.Ct.App.1990); *Stinson v. Brand,* 738 S.W.2d 186, 190 (Tenn.1987). Section 552 provides in pertinent part as follows:

§ 552. Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their *business transactions,* is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement of Torts (Second) § 552(1) (1977).

The parties admit that apparently no Tennessee court has previously addressed the issue of the applicability of a cause of action for negligent misrepresentation in an employer/employee discharge context, and the Court has found none on its own. The Tennessee cases involving negligent misrepresentation all involve commercial transactions. *See, e.g., Houghland v. Security Alarms &*

*Services, Inc.,* 755 S.W.2d 769, 774 (Tenn. 1988); *McElroy v. Boise Cascade Corp.,* 632 S.W.2d 127, 130 (Tenn.Ct.App.1982); *Merriman v. Smith,* 599 S.W.2d 548, 556–57 (Tenn. Ct.App.1979). In *Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228 (Tenn.Ct.App. 1976), the court stated:

In *commercial transactions* the law has recognized a less stringent standard of liability for fraudulent misrepresentations than the common law action for deceit. One who, in the course of his business, profession, or employment, or during a transaction in which he had a pecuniary interest, supplies false information for the guidance of others *in their business transactions,* is subject to liability for pecuniary loss caused by them by their justifiable reliance upon such information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. (citations omitted). This standard of liability substitutes a reasonable care standard for the common law scienter requirement. In other words, *in business transactions,* a defendant can be held liable for negligent misrepresentations.

*Id.* at 232 (emphasis added).

It is clear to the Court that Section 552 only applies to commercial or business transactions. First, the Court notes that none of the examples in the comments to Section 552 involve an employer/employee situation. Further, the language of Section 552 expressly refers to the negligent supplying of false information "for the guidance of others in their *business transactions.*" Restatement (Second) of Torts § 552(1) (1977) (emphasis added). Delta did not issue the Anti-Drug Memo to Shelby for his guidance in some business transaction. Also, the Court finds that allowing a claim for negligent misrepresentation in this particular context would be inconsistent with Tennessee's employment-at-will rule since it would allow a discharged at-will employee to attack through an action sounding in tort, what he/she is unable to challenge by an action for breach of contract. The Court believes that any such inroad on Tennessee's employment-at-will rule should be decided by the Tennessee Supreme Court or the Tennessee General

Assembly. For these reasons, the Court concludes that Shelby has no cause of action for negligent misrepresentation as a matter of law. Therefore, the Court GRANTS Delta's Motion for Summary Judgment on Shelby's negligent misrepresentation claim.

For the foregoing reason, Delta's Motion for Summary Judgment is GRANTED, and Shelby's claims are hereby DISMISSED in their entirety.